The window of the soul of this case is found in every piece of case law that this court has ruled on in the past, related to what it takes to search a person, their possessions, and to determine guilt or innocence. In this case, Mr. Hanft shouldn't have been searched, his backpack shouldn't have been searched, his residence should not have been searched, and more importantly, he should not have been found guilty of the charges as a result of those violations of the Fourth Amendment. When Mr. Hanft was found in the – and I'm presuming the court has, of course, read the facts, so I'm going to sort of readers' digest through them. When Mr. Hanft was found in the marijuana garden, there were four things the government alleged to create a reason for investigating him further. One was they had heard sounds, chopping or voices, but several of the agents themselves specifically said they're not sure. Then also that his presence there meant the difficulty in getting into the area. The officers described that they had to crawl in all fours to get there and got dirty. They didn't find any dirt on Mr. Hanft in recognition of that same type of difficulty in getting there. Assuming for argument purposes that's enough for a tarry stop, certainly the investigation into him being there is appropriate. They asked him some questions. He didn't want to give them his name. So in light of MacGyver, here we have the movement from searching him and checking him out and arresting him to his backpack. Those three things were the reason they investigated him. Can't say that wasn't appropriate. However, they now move to the backpack and decide that they're going to search the backpack based solely on the fact that he didn't give his name. On public land under MacGyver, you don't have quite the same Fourth Amendment rights as you might in your own personal property and your own private land. So assuming for argument purposes that you can get to the backpack, they search the backpack and find nothing in there associated with the marijuana garden. They allege during the course of this case later on that two AA batteries were sufficient to create some type of a nexus or probable cause to reach beyond the backpack to now the residence. But before I get to the residence briefly, I just want to point out that these two batteries were only two of four that are required for all of the garden timers that were found in the garden. There were 30 of them. They all needed four batteries. Two would be a meaningless value to any of them. And just because they were generic in nature and associated with those types of batteries, in and of itself is just a real stretch to get to where this case should have gone in the next step. Their own words in the appendix on page 109 says, At that point, this case should have ended. There should have been nothing further. There was nothing else to do. He didn't do anything wrong. In fact, what the government keeps avoiding identifying is several things that they didn't find. No dirt. No evidence of chopped trees, even though they said they heard chopping.   And no evidence of any of the other items. No, but yet they heard voices and alleged someone might have tried to escape. No clothes in the garden that were associated with him. There were clothes there, but they weren't his size. No foods that they found in the lean-to associated with any of the food found in his backpack. No fingerprints. No wire cutters. No cutting materials. No escape trails. And the no's are far greater than the reasons for which they wanted to take this case to the next level. There also were no photos. No surveillance. No informants. No confessions. No observations of cultivation. No evidence of harvesting. No evidence of chopping and concealment. And nothing to corroborate that he was there to manufacture marijuana. At that moment, it didn't end, though. Did he just stumble on the area? Well, that is the position that the defendant takes, that he just came upon it hiking around. He's a woodsman and a hiker, and he was walking around, drove his motorcycle up to an area called the Miami Circle and started walking, saw this masticated area, which was quite obvious to the naked eye. I mean, it's an area where a masticator, I don't know if you're familiar with him, I just learned about him through this case, wipes out everything in its path. So it's pretty obvious what had gone through there. It's not uncommon for curiosity for anybody who goes hiking or looking around in the woods to, in fact, investigate or hike down into something that looked interesting. Now, he alleges that he was looking for wood, firewood, that was something he uses. He wasn't out there because he was on a motorcycle to pick it up, necessarily, but that's why he was in the area. But there's also a lot of motorcycle trails in the area, four-wheel trails, and other things that would be common to the public. Now, public land is public land. I see a lot of people hike off-trail in the Sierra Nevadas. That's how they get lost, but nonetheless, they go off-trail, they do a lot of hiking, you have a lot of public land in the area where Mr. Haniff was located. But the problem is there's nothing else that kind of ties him into it, even if it's an unusual area for him to have walked by curiosity or otherwise. He didn't show that it was difficult. He didn't show any association with the garden, with the materials that he was in possession of, and the things that were in the garden themselves. In fact, their own testimony of all the agents when being asked by defense counsel at trial specifically points out over and over again the different things. Did you find this? Did you find that? Did you find this? Did you find that? They did not. So our position is that, first, the search of the backpack is illegal, but even if it isn't based on MacGyver, anything found in the backpack, they clearly state it was not associated with the garden. So at that point, everything's over. There's no evidence corroborating a nexus between him and that garden. Now they decide to do a search of the house. They go to the house. They look at the house. They drive by his Volvo, and his driver's license had a P.O. box number, so they call to get an actual address. They try to use the driver's license as some type of a probable cause nexus that had a P.O. box instead of his address. So they call. They get his address. They go up to his address, and they ended up searching his residence. They go into the attic. They smell this intense smell of marijuana, but yet their own testimony on page of the appendix on page 55 says, did you find any evidence that marijuana had ever been derived in the attic? No, we did not. Not that I recall. It's actual words. So they smell that. They look around. They search a truck. They see some leaves in the back of the truck. Turns out they're not marijuana. There's nothing they associate at that point with the marijuana garden. They come to his garden tool area in the barn, and they find similar types of timers that you found in the garden. And now they're alleging three of them were being used by the defendant in his home, but there were seven others in boxes that were not. Now, all along throughout this case, nobody goes back to do testing of anything to determine, and there weren't a fingerprint, so there weren't a footprint, so there was no forensic evidence of any kind. But none of them go back to take these boxes of the timers and take them over to see if the serial numbers match any of the timers over at the marijuana garden. I found that to be a little unusual. Most of the time, the timer boxes would have serial numbers on them or some identifying number to what was in the box. I may be wrong. It never came up, but it's something to contemplate. But either way, just because he had them, he didn't associate them with that particular marijuana garden or a marijuana garden at all. He had a garden in his home, and he was in use of three of those. Counsel, can you refresh my recollection? Didn't he have timers in his backpack? Pardon me? Did he have timers in his? No. He did not. No, sir. How about wire? No, sir. He had no timers or wire. No, sir. They just found those at his house. The timers, yes. They found two double-A batteries. They found the timers, the same type of timers that were in the marijuana garden, and they found wire which was of the same type that was in the box. They thought it was the same. They didn't take it over there to check it or to see if there was any cuts on the end that matched cuts on those wires and so forth. But they also didn't find it at his residence. It's more than what wasn't found. No drip lines, no tools that were associated with the garden, no pots like the pots where the plants were found in. They found one roll of wire that was similar to the wire of the garden. They found one roll of cloth similar to the cloth wrapped around the plants, but it was only enough for one plant. There were 3,500 plants, I think it was, over there. So this wasn't the kind of quantity that would immediately tell you that it was for the garden. These are quantities that are for personal use, and he had his own garden and he had his own materials there for that purpose. So barring getting to the house at all is what I don't think you can get to the house. I don't think anything that happened along the way can get you to the house. There's testimony in here that says that the addict itself, there was nothing that could prove there was any marijuana in there, though they alleged to smell it. The son smoked medical marijuana, so that smell could have come from that. I've never been in a case, and look, I'm not always the perfect lawyer, but I've never been in a case in the 25 years I've been practicing that has told me there's not one seed, not one little stem, not one little anything in a marijuana drying location that could be associated with such a project, much less associated back to this garden. They found nothing. I recommend the court in the appendix specifically read pages 60 to 77 and 102 to 109. In there, the lawyer is very specific about asking him, what did you find to associate this from the garden to him, to him to the backpack, the backpack to the garden, and then come up with some kind of extraordinary nexus to come and go ahead and search his residence. And after searching the residence, he still don't find enough, and then we extrapolate beyond credibility against the case law in this circuit. Thank you, counsel. We have from the government. Kevin Rooney on behalf of the United States. What I want to begin with is I think what counsel is doing is taking this court's mere presence cases that apply to the standard proof necessary to convict somebody at trial and applying that to probable cause for an arrest or for a search warrant. And all the mere presence cases are about the amount of evidence needed for a conviction. They're not about probable cause for an arrest or a search. So what the evidence established at the trial was there was this area that had been masticated. The agents, the Forest Service agents, had information from the contractors that had done the mastication, done this big project where they chopped up the vegetation, that there appeared to be evidence of human activity which the agents believed was a marijuana garden. The agents go to that area. It's very difficult to get to. It's very steep. It's treacherous to the extent that the vegetation's been chopped, leaves sharp pieces sticking out. So if you slip and fall, you can be impaled on it. They find a marijuana garden. They have to crawl through the brush to get to it. They find a marijuana garden. They find the defendant inside it. They heard voices. They only found one person. They saw the defendant leaning over. One person said there was a scraping sound. It was consistent with somebody putting wire around. They were putting chicken wire around plants that had containers that had marijuana plants in them. So I would urge the court that certainly there was probable cause to arrest the defendant. Well, let's start. Let's begin where you did. Are you saying that mere presence alone is enough to support probable cause? I'm saying under the circumstances of this case, absolutely mere presence would be enough to support an arrest. And what's your best case for that? I haven't found ñ I haven't seen a cite to that case. I haven't seen that specific issue isolated. But the Herrera-Gonzalez case, I believe that's the correct citation, cited in the government's brief, talks about somebody who said he was merely present at a methamphetamine lab. And the court went through the pros and cons of his argument for why he was merely present and how those things weren't borne out by the evidence. That, in fact, this person claimed, much like the defendant here, that he had just arrived at the place where there was a methamphetamine laboratory, that he had an innocent reason for being there, that he had been hired to take care of the property. He had sheared his sheep and he was still there just waiting for other instructions. And instead it was proven that he had prior connection with the other defendants there, the other people that were arrested. He had given them money after they were all arrested, that he had been involved in that property. So to the extent that mere presence, mere presence is a defense, but the evidence in this case. But it seems to me that the cases on mere presence in the narrow sense that you're talking about, supporting probable cause, always have mere presence plus some other facts. I don't think I've seen a mere presence case where someone is just found at the wrong place at the wrong time alone with no other supporting facts. I hear what the Court's saying. What I've seen in the research, and I'm not the person that wrote the brief, I'm not the person that argued the trial, all the mere presence cases I'm familiar with concern the quantum of proof necessary to sustain a conviction. And here we're talking about probable cause for an arrest. No, I understand that. I'm just saying I'm talking about the probable cause case. There's a case that's not cited by either party called Mills, United States v. Mills, which is pretty close to this one. It's a remote location, and if I'm recalling the facts correctly, they go through the fact that it may be the remote location played a part, but then they add in two or three other facts. The defendant starts to run. He yells an expletive. There are a few other things associated with that, and he more or less confesses at this scene. So you've got, you know, there's – but in terms of the narrow issue you're talking about, mere presence, I'm not sure I've seen a case in our circuit that says mere presence is enough by itself. Now, the government's position here is, A, in the circumstance of this case, there's – I would – an absolute fact situation has not really come to my mind other than the Ibarra case where your mere presence is you're in a public bar, the old Supreme Court case. There's a very innocent, easily understood reason why somebody's merely present in a bar, and that certainly doesn't give rise to probable cause to arrest. As opposed to this case, it was an extremely isolated, difficult-to-reach area, and this man's right in the middle of the marijuana garden, and then going again to get out of the hypothetical, was there mere presence. There were people talking, which would undercut the idea that he'd merely stumbled on, onto it if he's going to end alone, and there's sounds of where – You never did find the other person? No. Other alleged person? I can address those facts, but I'd like to stick with this thing. They heard scraping sounds, and Agent Meyer testified that it was consistent with putting the chicken wire around the containers, and the defendant was coming up from an area where there were containers. They burst through the remaining bit of brush, ordered the defendant to the ground, arrested him. His reaction immediately is, he doesn't want to tell them the name, he doesn't want to answer any questions. I think, yes, under the circumstance of this case, there's enough there for probable cause to continue the investigation and the searches. They search the backpack, and that comes into evidence at trial. They go back to the defendant's home with the search warrant. There's an overwhelming odor of marijuana. There's timers that are consistent with the timers in the garden. There's both three timers in the house, and from what I saw of the record, the timers were just there and not in use. And there's ten empty timer boxes. There's seaweed extract and fish emulsion, which the witnesses say they've seen used in other marijuana gardens, although they didn't say they'd seen it in this particular one. And I would say most incriminating is there's this overwhelming smell of fresh marijuana, and to the different witnesses talked about, they knew the difference in smell between dried, older marijuana and fresh marijuana, and there was this smell of the fresh marijuana. So what you're saying is that would negate the explanation that it was the son smoking medical marijuana, which would be older, dried marijuana. Correct. And what appears very reasonable from the evidence, about 45 minutes to an hour after they had entered the garden, there was 75 to 80 yards more of garden from the site where the defendant was arrested to the end of the garden. They heard a motorcycle start up, and they had testified it took them about 45 minutes to hike down to this garden from where they had left their vehicles. They heard a motorcycle start. The reason I'm saying that is not to several hours later that they search the defendant's residence where they find the defendant's son in bed, laying in bed with his clothes on and his clothes are dirty. The reasonable inference is the son went back to the home, removed the marijuana that he was trying to make. Where's the testimony that they heard the motorcycle? I don't recall that. I have an awkward pause while I go through my notes. I can send the Court a note, or I can just flip through my notes, because they heard it. Excuse me? It must be in there. It's Officer Meyer. It's approximately Reporters' Transcript 284. 282, he says it's a half mile from the motorcycle trails. 284, there's a note of it's 45 minutes to an hour after the arrest, the motorcycle started. And he said it was roughly a half mile, three-quarter miles away, but it was very hard to approximate the distance. And he testified he heard the motorcycle start? Right, and that was the first motorcycle sound he had heard during this incident. You know, they hadn't heard motorcycles running. About 45 minutes to an hour after the arrest, they hear a motorcycle start. And I say the reasonable inference is the son went back, removed the marijuana from the house. It's pretty hard to remove everything. Pretty hard to remove everything. No stems, nothing, residue? Yeah, certainly. It is very difficult. What we've got is a jury determination. And, of course, any reasonable inference that supports the verdict is sufficient. I guess my recollection is the defendant testified in his own defense. Correct. Correct. And he, unlike most of the mere presence cases, I went through the list that the Herrera-Gonzalez case has. There's a passenger in a car. There's a house guest. There's a caretaker. This is a person that owns the property on which the incriminating evidence is found. The smell of marijuana, the timers, the fish emulsion, et cetera. Except for the truck. Excuse me? He didn't own the truck. Correct. And no evidence from the truck was put into trial. All right. I see my time's almost expired. I'd be happy to answer any questions from the Court. And, you know, we'll address the Mills case in the letter. I'm not familiar with it. Any further questions? Thank you. Thank you. A little time for a bubble. I may agree just to distinguish the questions that were raised, and that is simply that the cases of this Court, you've got to start at the marijuana garden. The cases in this Court require more than just mere presence, even for probable cause, to search the backpack. But once the backpack was searched and it was determined and the evidence supports it and the statements of the officers say it, nothing was found there to associate with the garden, the case should end there. The rest of the story, regardless of whether you believe the inferences upon inferences upon inferences or extrapolations of theories, you can't get to that because you can't get past the garden search. It is somehow associated. Why aren't the batteries enough? I know there's an innocent explanation you give for the batteries, but why the fact that you've got batteries in the backpack that don't match anything that he has, no flashlight? Later he said it was a mag flashlight, but at the time they've got two batteries in the backpack that match the batteries on the timers. Why isn't that enough? Well, two points on that. One is that they took four batteries, so two wouldn't have made a difference to any of them. Right. Second of all... But, I mean, they still match. It doesn't make any, I mean... I would be... He had no other purpose for the batteries except... Couldn't the jury have found that... I couldn't have left them in the backpack. Couldn't the jury have found that he had had a bunch of batteries and he put them in the timers and he had two left? I mean, that's, I mean... I mean, anything is possible in this case, and that's the concern I have about how we end up in these situations. I carry batteries with me for my dictation machine, but I don't always have my dictation machine. So I don't know that that's a way to establish a... The type of nexus is the cases like Lucard's A and a couple of the others that the Court has ruled on actually is strong enough to get there. Usually you have something that's corroborative in terms of an evidentiary type thing, like a witness lied, a confession, running lies. So there are two questions. One is sufficiency, and I just want to leave that aside. And the other one is probable cause. Correct. Why don't the batteries give you probable cause for another search? I don't think they should have, because they aren't significant enough. They identified, their own testimony says that nothing in the backpack is associated with the garden. Just because they're the same batteries and there are two of them doesn't connect because there were four required. I don't know what two would have done. And I've carried a backpack with batteries in it off in other countries, left it in there, forget they're there, like money in a pocket. It's the same thing. I can't say that that's strong enough. That's me, though. So, of course, this Court may say so otherwise. But thank you very much. Thank you, counsel. Thank you both for your arguments. The case, as heard, will be submitted.
judges: Thomas, Paez, Ezra